Submitted on record and briefs October 29, 1979, reversed
February 11, reconsideration denied March 20,
petition for review denied April 15, 1980 (289 Or 45)

## BALDWIN, et ux,
### *Respondents,*
#### *v.*
## MILLER,
#### *Appellant.*

### (No. 77-1538-L-3, CA 13061)

606 P2d 629

[371]

Brian J. Hawkins, Grants Pass, filed the brief for appellant.

Ervin B. Hogan, Medford, filed the brief for respondents.

Before Schwab, Chief Judge, and Buttler and Roberts, Judges.

SCHWAB, C. J.

**SCHWAB, C. J.**

Defendant, who operates a private company that offers fire fighting service to individual property owners in certain rural areas, appeals from a judgment that the trial court, sitting without a jury, entered for plaintiffs. Defendant had attempted to fight a fire that broke out in a home plaintiffs were constructing. Defendant's efforts were ineffectual, and the structure was a total loss. There is some evidence to support, at least arguably, the trial court's conclusion that defendant's efforts were conducted negligently. The issue is whether, as this case was pleaded and tried, defendant was under any duty to plaintiffs.

I

Precise identification of the issue is critical because plaintiffs' theory of the source of defendant's claimed duty has apparently shifted since this case began. As we interpret it, plaintiffs' complaint alleges a duty arising solely from an express contract:

" * * * [D]efendant * * * undertook to provide fire protection service to subscribers to such services for monetary or other considerations.

" * * * [P]laintiffs had subscribed to the fire protection services offered by defendant * * * and defendant had agreed to provide fire protection service to plaintiffs * * *.

" * * * [D]efendant undertook to provide fire protection service to extinguish said fire in accordance with defendant's agreement with plaintiffs as above described * * *."

Plaintiffs' brief in this court advances alternative theories:

" * * * [D]efendant was bound to exercise due care in providing fire protection service at even the request of a stranger [*i.e.*, a non-subscriber] in the area. * * * Plaintiffs' request for service at the time of the fire and defendant's response would create an implied contract between them * * * out of which a duty upon the part of defendant to exercise reasonable care would arise."

[373]

There is some support for plaintiffs' alternative theories—and would be even more support for approaching this case as an undertaking to render aid which imposed a duty of reasonable care. Restatement (Second) of Torts, § 323 (1965).[1] The problem, however, is that this case was not tried on any of these theories, attractive though they may now be; rather, this case went to trial on plaintiffs' complaint that only alleged an express contractual duty. We limit our consideration to the sole issue thus framed.

## II

Defendant argues that as a matter of law the subscription agreement referred to in plaintiffs' complaint imposed no duty to fight the fire that consumed plaintiffs' house under construction. Defendant's contention is based on the undisputed fact that when the subscription agreement was issued plaintiffs were residing at 2861 Thompson Creek Road, but had since moved to 2535 Thompson Creek Road, and were building their new house which burned at 2720 Thompson Creek Road. Defendant argues that the subscription agreement applies only to the property described therein, *i.e.*, 2861 Thompson Creek Road, did not cover plaintiffs' new address, *i.e.*, 2535 Thompson Creek Road, and did not apply to all property that plaintiffs have any interest in, *i.e.*, 2720 Thompson Creek Road.

Plaintiffs first respond that defendant failed to preserve this issue in the trial court by motion for nonsuit or other motion contending this case turned

---

[1] Restatement (Second) of Torts, § 323 (1965), is entitled, "Negligent Performance of Undertaking to Render Services." It provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

"(a) his failure to exercise such care increases the risk of such harm, or

"(b) the harm is suffered because of the other's reliance upon the undertaking."

solely on that legal issue. Whether and when such motions are necessary in law actions tried without a jury has had a checkered history. In *Karoblis v. Liebert*, 263 Or 64, 75, 501 P2d 315 (1972), the Supreme Court held that

" * * * [a] defendant in a law action tried to the court without a jury may not test the legal sufficiency of plaintiff's evidence at the close of plaintiff's case. If he wishes to challenge the sufficiency of the evidence he must rest his case and submit the matter to the court on its merits."

In 1975 the legislature amended former ORS 18.230 to permit a defendant in a nonjury trial to move for and obtain a judgment of nonsuit. In *Adamson v. West Valley Associates*, 274 Or 11, 17, 544 P2d 578 (1976), the Supreme Court noted this statutory amendment "changed the procedure established by *Karoblis*," but did not elaborate on what it understood the new procedure to be.

In *Hendrix v. McKee*, 281 Or 123, 575 P2d 134 (1978), the plaintiff who had lost after a nonjury trial appealed, contending there was no evidence to support the trial court's judgment. The Supreme Court stated:

"We might well inquire initially whether this assignment is properly before this court. It has long been the rule in this state that unless a party makes a motion for nonsuit or for a directed verdict at trial, he cannot complain on appeal that there was insufficient evidence to support a verdict against him. *See, e.g., Verret Construction Co. v. Jelco, Inc.*, 280 Or 793, 795, 572 P2d 1029 (1977), and cases cited therein.

"While the decided cases have involved jury trials, some members of the court see no good reason not to apply this salutary rule to law cases tried to the court. Its application would have the effect of requiring a litigant to apprise the trial judge of this contention. Upon an unfavorable ruling, the sufficiency of the evidence could be tested upon appeal. The appellate process is predicated upon the aggrieved party's establishing an *error* on the part of the trial judge. It is patently unfair to charge such error without having

[375]

given the judge the opportunity to avoid it. It is incumbent upon a party who believes he should prevail on the evidence, *as a matter of law*, to advise the trial court of this belief prior to submission of the factual issues for resolution. Failure to do so should deprive that party of his right to test the sufficiency of the evidence upon appeal. Just as is the motion for a directed verdict, this is, in effect, a demurrer to the evidence * * *." 281 Or at 125, n 2.

The court in *Hendrix* did not mention the 1975 amendment to former ORS 18.230.

Former ORS 18.230 was repealed by Oregon Laws 1979, ch 284, § 199, and, for present purposes, replaced by Oregon Rules of Civil Procedure (ORCP), Rule 54 B.(2), which provides in part:

"After the plaintiff in an action tried by the court without a jury has completed the presentation of plaintiff's evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a judgment of dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief * * *."

Thus, since 1975 a defendant in a nonjury case has been permitted to move for a judgment of involuntary nonsuit (old terminology) or judgment of dismissal (new terminology) at the close of the plaintiff's case.

The question remains of whether a defendant must do so in order to preserve for appellate review any claim that there was insufficient evidence to support a judgment against him. For the reasons stated in *Hendrix v. McKee, supra*, we hold that an appropriate motion addressed to the trial court is essential to preserve that issue for appellate review.

### III

In this case, however, we conclude defendant's failure to move for a nonsuit in the trial court does not foreclose consideration of the issue she raises in this court, because that question depends ultimately on a

question of law other than the sufficiency of the evidence, specifically, as the trial court noted, on an interpretation of the contract pleaded as controlling.

Plaintiffs' allegations that "defendant had agreed to provide fire protection service" to them and that "defendant undertook to provide fire protection service to extinguish said fire in accordance with [that] agreement" are set out above. The facts that, since entering into a subscription agreement with defendant, plaintiffs had moved to a second address and were constructing the house that burned at a third address are set out above.

Given these allegations and facts, there was some initial confusion in the trial court about whether plaintiffs' cause of action was based on contract or tort.

"[Plaintiffs' counsel]: I don't think that a precise subscription agreement covering a particular piece of property is an essential element of the situation. The duty arises out of the fact that the Defendant is engaged in the business for profit and undertook, I think the evidence establishes, to respond to this fire. I don't think that it matters whether the Plaintiff had a subscription agreement relating to this particular property or not * * *."
" * * * * * *

"[Defendant's counsel]: Your Honor, I think the error in that is that the Plaintiff has filed his complaint here and the complaint speaks solely to a subscription agreement. Throughout the complaint it says there is an agreement and the services rendered under that agreement * * *.

"THE COURT: The thrust of the complaint is negligence.

"[Defendant's counsel]: The thrust of the complaint is breach of contract, your Honor. Every paragraph in that complaint refers to the subscription agreement.

"THE COURT: Well, there is where we part ways. What is your theory [plaintiffs' counsel]? Contract or tort?

[377]

"[Plaintiffs' counsel]: My theory, your Honor, is tort. It's an action for negligence.

"THE COURT: It's a garden variety negligence cause of action.

"[Defendant's counsel]: Your Honor, he has pled contract.

" * * * * *

"THE COURT: It's a borderland. If they do something and do it negligently, there's a choice on the part of the Plaintiff whether to proceed on contract or tort.

"[Defendant's counsel]: The complaint is clearly based on contract. It reads—every paragraph reads—

"THE COURT: I think it's a law-imposed duty. If they're going to do something, they'd better do it in a reasonable workman-like manner * * *."

We have already recognized that there can be a "law-imposed duty" to perform an undertaking to render aid "in a reasonable workman-like manner." *See,* n 1, *supra.*But we have already concluded that plaintiffs did not plead such a cause of action, but instead alleged duty arising from the firefighting subscription agreement entered into by parties long before the fire occurred.

The court's and counsels' view of the case seems to have shifted as the trial progressed. The following occurred during defendant's testimony toward the end of the trial:

"Q  In the case we have here where there is a residence and then a house being built, what is your policy with regard to that if there [are] two different residences?

"A  They have to make an agreement through the office. If we don't know about it, it's not covered.

"Q  In providing your free service to the volunteer, which residence would you cover?[2]

"A  The one he is living in.

---

[2] There was evidence that one of the plaintiffs had been a volunteer fireman for defendant, and that in return defendant has provided plaintiffs with a fire subscription agreement free of charge.

[378]

"[Plaintiffs' counsel]: Your Honor, I'll object to this line of inquiry. I think it is just simply the witness' legal conclusions, and—

"THE COURT: Yes, I think the agreement is in writing before the Court. We follow the objective theory of contract in this state, so it's up to the Court to construe the legal effect of the writing irrespective of what her policy may be regarding that writing.

"[Defendant's counsel]: Well, it seems to me that what residence she signs up is relatively—

"THE COURT: Well, I've read it, and it just refers to a residence. It doesn't say that that's the sole property covered. You're asking her to construe that writing, if I follow your line of questioning. I've read it closely. The objection is sustained."

We agree with the trial court that interpretation of the parties' agreement is here a question of law for the court. *See, Timberline Equip. v. St. Paul Fire and Mar. Ins.*, 281 Or 639, 576 P2d 1244 (1978); *Hekker v. Sabre Construction Co.*, 265 Or 552, 510 P2d 347 (1973); *Quillin v. Peloquin*, 237 Or 343, 391 P2d 603 (1964). Given that the issue of defendant's duty under plaintiffs' complaint depends ultimately on interpretation of the parties' agreement, given such interpretation is a question of law, and given that the trial court so understood the case, whether defendant moved for a nonsuit or not made no practical difference. By such a motion defendant would have been contending, for present purposes, that under the interpretation of the parties' agreement she was urging, she was entitled to judgment. That was exactly the position defendant took throughout the trial. A motion for a nonsuit would have added nothing.

## IV

We turn to interpretation of the agreement. The printed fire service subscription agreement has blanks where the subscriber's "mailing address," "house number location" and "second house location" are handwritten when the agreement is executed. The agreement in effect between plaintiffs and defendant at the time of the fire had the following entries:

[379]

Mailing Address - "2861 Thompson Cr. Rd."
House Number Location - "Same"
Second House Location - Blank.

The trial court was correct in stating that nothing in the agreement expressly says the "house number location" is the only property covered. But we think that is obviously implicit. Why else would "house number location" even be included in the agreement in addition to "mailing address"?

Plaintiffs must do more than contend the agreement automatically follows them to a new residence. It was not their new residence at 2535 Thompson Creek Road that burned; it was their third house, the one under construction at 2720 Thompson Creek Road, that burned. So plaintiffs must contend that the agreement automatically attaches to all property in which they may acquire any interest.

That contention is refuted by the provision in the agreement for the listing of "second house location," which was left blank in the agreement between plaintiffs and defendant. We do not think this provision was immaterial or meaningless. On the contrary, we think it was likely material for financial (*e.g.*, the setting of defendant's fee) and geographic (the area in which defendant can provide service is limited) purposes. That is the only intent and purpose we can see to listing "second house location"—an intent and purpose to cover only listed property, rather than having coverage attach to all property that a subscriber may have or acquire.

Defendant had no contractual duty to plaintiffs regarding plaintiffs' property that burned at 2720 Thompson Creek Road.

Reversed.